666 A.2d 462 (1995)
In re D.H., Appellant.
No. 91-FS-1073.
District of Columbia Court of Appeals.
Argued May 25, 1994.
Decided September 29, 1995.
*465 Stephanie Harrison, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.
Rosalyn Calbert Groce, Assistant Corporation Counsel, with whom John Payton, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellee.
Before WAGNER, Chief Judge,[*] and FERREN and TERRY, Associate Judges.
WAGNER, Chief Judge:
This is an appeal by a juvenile, D.H., from an adjudication of delinquency upon a finding of guilt of second-degree murder while armed with a dangerous weapon (D.C.Code §§ 22-2403, -3202) (1989 Repl. & 1993 Supp.), carrying an unlicensed pistol (D.C.Code § 22-3204) (1989 Repl. & 1993 Supp.), and possession of a firearm and ammunition without a valid registration certificate (D.C.Code § 6-2311) (1995 Repl.). D.H.'s principal argument on appeal is that the trial court erred in denying his motion to dismiss because the twenty-one month interval between the date of the homicide and the trial violated his due process right to a speedy trial in that the delay prejudiced his ability to present an adequate defense and deprived him of the benefit of rehabilitation in the juvenile system. D.H. also argues that the trial court erred in denying his motion to suppress a confession obtained by the police while he was in custody and outside of the presence of his parent or legal counsel in violation of Super.Ct.Juv.R. 105(f). We hold that a juvenile has a due process right to a fair trial, including a speedy one, consistent with the statutory purpose of the juvenile code, but consonant with the goals of protection of the child and the community. However, on the particular facts of this case, we find no violation of D.H.'s rights which warrants reversal. Concluding that Super.Ct.Juv.R. 105(f) is inapplicable under the circumstances presented, we hold that the trial court did not err in denying the motion to suppress statements. Therefore, we affirm.

I.
On February 25, 1989, appellant, D.H., was attempting to sell phencyclidine (PCP) to Judith Krunklin in the 2500 block of Sheridan Road, S.E. Ms. Krunklin refused to purchase the drugs after tasting them. According to the trial court's findings, Ms. *466 Krunklin and the two people with her were regular purchasers. D.H., who was carrying a .25 caliber handgun, argued and struggled with Ms. Krunklin in an intimidating way in an attempt to force her to buy the drugs. D.H. then shot Ms. Krunklin in the back, and she died as a result of her wounds.
On October 27, 1989, Detective Michael Sullivan, who was assigned to investigate the murder, obtained an adult arrest warrant for D.H. There was an inaccuracy in the records of the Metropolitan Police Department (MPD) which listed D.H.'s birth year as 1972 instead of 1973, thus making it appear that he was sixteen years old at the time of the murder. At the time Detective Sullivan obtained the warrant, D.H. had one delinquency case pending in the Family Division of Superior Court, and he was committed to the Department of Human Services (DHS) in another. D.H. was arrested again as a juvenile on November 11, 1989, in an unrelated matter. In the latter case, the trial court ordered that D.H. be detained at the Children's Center, a detention facility for children.
On November 20, 1989, Detective Sullivan arranged for D.H. to be brought from the Children's Center to the Criminal Division of Superior Court, where he was presented on a felony complaint charging second-degree murder while armed with a dangerous weapon, in violation of D.C.Code §§ 22-2403, -3202. A Superior Court hearing commissioner set a $10,000 bond for D.H., which he was unable to post.[1] Therefore, D.H. was sent to the District of Columbia Jail. On December 4, 1989, the court held a preliminary hearing and found probable cause to bind D.H. over for grand jury proceedings.[2] Two days later, D.H.'s two pending juvenile cases were scheduled for trial. However, at the request of D.H.'s counsel, the cases were continued for a status hearing on January 19, 1990 "to see what happens in the homicide case ... [because] it may resolve everything...." At the status hearing in January, the cases were again continued because the homicide charges were still pending.
On February 12, 1990, nearly three months after being placed in the D.C. Jail, D.H. was transferred from the Criminal Division to the Family Division of the court when it was discovered that D.H. was only fifteen years of age at the time of the homicide. At the initial hearing in the Family Division that same day, an Assistant Corporation Counsel for the District of Columbia (ACC) requested a "five day hold" on filing a petition charging D.H. because the Corporation Counsel's Office had received the case from the United States Attorney's Office just one to two days earlier and required time to investigate.[3] The ACC specifically stated that the reason for the request was "because we have to go over everything that's been done charging him. See if we want to charge him or send it back to the U.S. Attorney ... as an adult."
The trial court denied the request, concluding that the government had already had sufficient time to make a decision. Therefore, the court passed the case for half an hour to allow the ACC time to prepare a petition. When the case was recalled, the ACC represented that the government would not file a petition at that time and requested the court to hold D.H. "on the two cases that he's detained in." The trial court stated, "I think that closes the jacket. And, you can refile the petition if you want to, when you want to file it." The trial court entered an order detaining D.H. at the Children's Center in the two unrelated juvenile cases.[4]
*467 On February 15, 1991, six months after D.H. was released from the custody of DHS, Detective Sullivan filed an affidavit in support of a custody order for D.H.'s arrest based on the February 1989 homicide.[5] The custody order was virtually identical to the arrest warrant obtained in October, 1989. On February 28, 1991, D.H. was arrested for possession with intent to distribute a controlled substance (cocaine) (PWID). At that time, the government also petitioned the second-degree murder while armed charge and the related weapons offenses.
On April 20 through 22, 1991, a hearing was held on D.H.'s motion to suppress statements on the ground that they were obtained in violation of Super.Ct.Juv.R. 105(f).[6] At the hearing, Detective Sullivan testified that he developed probable cause to believe that D.H. committed the murder and submitted an affidavit in support of an arrest warrant. He testified that he obtained D.H.'s date of birth and PDID number from the Identification and Records Division of the MPD. The official record card listed D.H.'s date of birth as September 3, 1972, and based on that record card, Detective Sullivan calculated D.H.'s age as sixteen years old at the time of the homicide. Therefore, he believed D.H. to be chargeable as an adult under D.C.Code § 16-2301(3)(A) (1989).
Detective Sullivan obtained the warrant from a judge of the Superior Court on October 27, 1989, based on an affidavit which was reviewed preliminarily by an Assistant United States Attorney. Shortly thereafter, Detective Sullivan learned that D.H. was at the Children's Center under a commitment in an earlier case, and he arranged for D.H. to be brought to court by the transportation service for the Children's Center on November 20, 1989. Detective Sullivan picked D.H. up at the courthouse on the felony warrant and took him to the Homicide Division. Mr. Randolph Baker, the Assistant Superintendent at the Cedar Knoll Youth Center, testified that the Center was required to comply with a court-issued arrest warrant for a juvenile. He also testified that it was the Center's usual practice to send the juvenile to Superior Court when a warrant for his arrest was pending.
In an interview room of the Homicide Branch of the MPD, Detective Sullivan informed D.H. that he was under arrest for the murder of Ms. Krunklin and advised him of his Miranda rights.[7] D.H. indicated in writing on a PD-47 rights card that he understood his rights and was willing to answer questions without consulting a lawyer or having a lawyer present.[8] Before interviewing D.H., Detective Sullivan did not ask permission of D.H.'s parents or his counsel in the unrelated juvenile cases. D.H. agreed to answer all questions and to give a statement on videotape. During, the videotaped interview, D.H. was shown the rights card that he had signed previously and acknowledged his understanding of his rights and his willingness to answer questions without a lawyer being present. D.H. then confessed that he shot Ms. Krunklin, but he stated that he did not mean to kill her. The motions judge issued a written order denying the motion to suppress.[9]
*468 D.H. filed a motion to dismiss pursuant to Super.Ct.Juv.R. 48(b) on the grounds that the government unnecessarily delayed petitioning the case from February, 1990 until February 28, 1991. D.H. argued that his defense was impaired as a result of the delay because a building and a gas station across from the crime scene had since closed down, and therefore, he was unable to locate possible witnesses who might have been around on the night of the crime.
At the hearing, the ACC admitted that the case had been inactive for a year, that no investigation was conducted during that period, and that the case somehow "fell through the cracks." The ACC further explained that the Corporation Counsel's Office received the case from the United States Attorney's Office only one to two days before the initial hearing in February, 1990 and that it had to determine whether to petition the case or to transfer it to the Criminal Division for adult prosecution. The motions judge denied the Rule 48(b) motion, concluding that dismissal was not in the interest of justice or the welfare of the child.
On July 29, 1991, appellant and the government stipulated to the evidence at trial. The government's evidence consisted of the grand jury transcripts of the testimony of people who were with the decedent at the time of the shooting, the respondent's videotaped statement, the autopsy report, the bullet removed from the decedent's body, and documents relating to the weapons offenses. The trial court made findings of fact and conclusions of law and found D.H. guilty of the offenses as charged. On August 14, 1991, one month before appellant's eighteenth birthday, finding that D.H. had a continuing need for care and rehabilitation, the court committed D.H. to the DHS for an indeterminate period not to exceed two years and placed him at the Children's Center.

II.
D.H. argues that the trial court erred in denying his motion to dismiss the petition. Specifically, D.H. contends that dismissal is required because: (1) the government violated D.C.Code § 16-2305(d) (1989 Repl.) by failing to petition the case within seven days of the referral of the complaint against him to the court; and (2) the government failed to file the petition within one year of the complaint in violation of D.H.'s due process and speedy trial rights. We conclude that dismissal was not mandatory under the statutory scheme and that the trial court did not abuse its discretion in denying the motion to dismiss. An analysis of the factors pertinent to D.H.'s due process and speedy trial claims requires us to reject them. We consider each of these arguments in turn.

A. Interpretation of D.C.Code § 16-2305(d)

D.H. points out that D.C.Code § 16-2305(d) requires the government to file a petition in a delinquency case within seven days after a complaint has been referred to the Director of Social Services and that the requirement is mandatory. This provision of the Code provides in pertinent part:
A petition shall be filed by the Corporation Counsel within seven days (excluding Sundays and legal holidays) after the complaint has been referred to the Director of Social Services, except as otherwise provided in section 16-2312.[10]
D.C.Code § 16-2305(d). We have not previously determined whether the government's failure to adhere strictly to this timeline requires automatic dismissal of a petition *469 charging delinquency. The facts presented and petitioner's argument require us to make that determination.
After it was discovered that D.H. was 15 years old at the time the petitioned offense occurred, the case was transferred from the Criminal Division to the Family Division of Superior Court and referred to Social Services, which made a recommendation on February 12, 1990, that the government petition the case. At the initial hearing, the ACC requested a "five day hold"[11] on filing the petition to allow time to review the case and to determine whether to petition the case or to refer it back to the United States Attorney for prosecution as an adult. See D.C.Code § 16-2307(a)(1). The court informed the assigned ACC that it would deny the request if the Corporation Counsel was unable to file the petition after a pass of the case for a half hour. At that time, the trial court also stated that the ACC had not yet shown good cause for the delay as required by statute and that upon denial of the five day hold, the government "can bring this charge whenever you want to." The government was unable to file the petition by the time the case was recalled, and the trial court closed the case jacket and again stated, "you can refile the petition if you want to, when you want to file it." D.H. was then detained at the Children's Center in two unrelated cases. It was not until February 21, 1991 that the Corporation Counsel obtained a custody order in connection with the charge. Following D.H.'s arrest on the custody order on February 28, 1991, the Corporation Counsel filed a petition charging D.H. with murder. D.H. contends that the government violated the plain language of D.C.Code § 16-2305(d) in filing the petition more than one year after the Director of Social Services made a preliminary investigation and recommended that the government petition the case.
D.H. cites to the legislative history of the present juvenile code, which reflects a congressional intent to provide for swift adjudications in juvenile cases. The Senate conferees were convinced that effective treatment of juveniles required a speedy process. STATEMENT OF THE MANAGERS ON THE PART OF THE SENATE SUBMITTED REGARDING THE CONFERENCE ACTION UPON S. 2601, THE PRESIDENT'S CRIME LEGISLATION FOR THE DISTRICT OF COLUMBIA, S.Rep. No. 91-620, 91st Cong., 2d Sess. at p. 16 (1970) (Senate Report). To that end, they insisted upon incorporating some time limits, "as the appropriate response to the unparalleled problems of delay and recidivism detailed in extensive hearings on the new juvenile code before the Senate D.C. Committee." Id. However, they included no provision for automatic dismissal of cases involving juveniles where statutory time limitations were not met. See id. On the contrary, they expressed explicitly their intention that the time provisions not be enforced by dismissal as the following passage from the report discloses:
It bears mentioning that the Senate conferees do not recommend enforcement of the several limits, statutory and otherwise, by the dismissal of cases or the disallowance of proceedings. The Senate conferees oppose "punishing" the juvenile system and society for these failings.
Id. The Senate conferees chose instead to rely upon responsible government officials to monitor the degree of compliance and noncompliance and to make adjustments in budgeting and utilization of resources in an effort to meet the timetables. Id. In light of this legislative history, we must reject any argument that Congress intended automatic dismissal as the price for non-compliance with the time limitations set forth in this section of the Code.
However, D.H. argues that the plain language of the statute makes mandatory the filing time, which includes filing after a prior dismissal without prejudice. In interpreting a statute, we first look to the plain meaning of its language, and if it is clear and unambiguous and will not produce an absurd result, we will look no further. Citizens Ass'n of Georgetown v. District of Columbia Bd. of Zoning Adjustment, 642 A.2d 125, 128 (D.C. 1994) (citations omitted); Butler v. Butler, 496 A.2d 621, 622 (D.C.1985). We have said that "[w]here a statute is clear on its face, there is no need to engage in an analysis of *470 legislative intent." Id. However, we conclude that such an analysis is required in connection with Section 16-2305(d) in light of its purpose and the overall statutory scheme.
Section 16-2305(d) of the Code provides that the petition "shall" be filed within seven days after referral of the complaint to the Director of Social Services, with a limited exception. Whether this language has mandatory effect is a question of statutory construction. "Unless the context otherwise indicates the use of the word `shall' (except in its future tense) indicates a mandatory intent." 1A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION, § 25.04, at 453 (5th ed. 1993). However, the directory, as opposed to mandatory, character of a statute may be indicated by its purpose and how that purpose is expressed. Id. Words, such as "shall," may be construed as directory if they do not relate to the limits of power or jurisdiction, but to the manner in which the power is to be exercised. Id. at 454. "[W]here the time, or manner of performing the action directed by the statute is not essential to its purpose, provisions in regard to time or method are generally interpreted as directory only." Id.
Insofar as our juvenile code is concerned, Congress identified its purposes to be the protection of the community and the child through treatment and rehabilitation. D.C.Code § 16-2305; see District of Columbia v. Jerry M., 580 A.2d 1270, 1278 (D.C. 1990); see also Senate Report at 16. An interpretation which requires the trial court to dismiss for failure to meet strict time provisions such as those involved here would not advance those purposes. See In re Keith G., 325 Md. 538, 601 A.2d 1107, 1112 (1992) (the purpose of juvenile statutes, to treat and rehabilitate delinquent children, would not be served by the sanction of dismissal). Moreover, the statute also provides that "[i]n all proceedings in the [Family] Division, time limitations shall be reasonably construed ... for the protection of the community and of the child." D.C.Code § 16-2330(a) (1989 Repl.). This statutory purpose lends support to the argument that the time provisions are not mandatory and jurisdictional, a point further buttressed by the legislative history of the juvenile code. Clearly, neither the language of the statute nor the legislative purpose precludes the government from refiling a petition dismissed by the trial court without prejudice as a sanction for failure to file the petition within the time frame set forth in § 16-2305(d).[12]
That does not mean that the government can violate with impunity the time frames set forth in the statute. We hold only that, consistent with the overall statutory purpose and the legislative intent, a technical violation of the time limitations set forth in § 16-2305(d) does not require automatic dismissal nor preclude the subsequent filing of a petition after dismissal of the case without prejudice for a violation of those time limits. Such a result would be too far at odds with the goals of the statute. Whether the sanction of dismissal of the petition or some other sanction should be imposed will depend upon the facts and circumstances of the case and a determination by the trial court of the appropriate sanction in the exercise of its sound discretion. See In re M.C.F., 293 A.2d 874, 878 (D.C.1972).

B. The Rule 48(b) Argument

D.H. argues that the trial court abused its discretion in denying D.H.'s motion to dismiss pursuant to Rule 48(b) because it applied incorrect principles and failed to consider the relationship between the rehabilitative purpose of the juvenile system and the timetable set forth in the statute to achieve that end. He contends that Super.Ct.Juv.R. 48(b) serves the purpose of enforcing the legislative scheme which has as its purpose assuring expeditious and effective treatment of children adjudicated delinquent. Thus, he argues that the delay between the delinquent act and disposition in this case has thwarted the rehabilitative purpose of the statute in his case which warrants dismissal.
Super.Ct.Juv.R. 48(b) provides

*471 Even though the [Family] Division may have [acquired] jurisdiction, it may at any time during or at the conclusion of any hearing dismiss a petition and terminate the proceedings relating to the child, if such action is in the interests of justice and the welfare of the child.... Unnecessary delay in the filing of a petition or in bringing a respondent to a hearing or disposition is a factor to be considered by the Division when deciding whether to dismiss a petition.
A dismissal under Rule 48(b) is within the trial court's sound discretion, subject to review for an abuse of discretion. District of Columbia v. D.E.P., 311 A.2d 831, 832 (D.C. 1973).
D.H. contends that the trial court relied upon the irrelevant consideration that no single prosecutor in the case had been more than negligent in failing to petition the case for so long and gave undue weight to the seriousness of the offense.[13] Although D.H. concedes that the seriousness of the offense is an appropriate factor for the court to weigh, he takes the position that it should have been considered in the context of the pace at which Congress intended the juvenile system to work. A review of the record discloses that in exercising its discretion to deny the motion to dismiss, the trial court considered the reasons for the delay, the interest of justice, the welfare of the child, the seriousness of the offense charged, and the child's prior adjudications. In so doing, it considered proper factors and no improper factors. Having weighed those factors, we find no abuse of discretion in the trial court's ruling.

C. The Due Process and Speedy Trial Claims

D.H. argues that the government's failure to file a petition for more than one year after the complaint was received and dismissed violated his due process rights. Relying upon a case from the New York Family Court, In re Gifford, 113 Misc.2d 532, 449 N.Y.S.2d 598, 600 (Fam.Ct.1982), he contends that a violation of the specific statutory time frames violate due process. In Gifford, the court dismissed a delinquency petition as untimely, holding that violation of certain specific pre-accusatory statutory procedures violated due process, considering the goals of the juvenile statute and its emphasis on prompt adjudications. Id., 449 N.Y.S.2d at 609. The Gifford decision is based upon an analysis of the New York statute. The New *472 York Family Court was persuaded that the delay in filing of the delinquency petition for eleven months in violation of the statute defeated the statutory purpose and violated fundamental principles of fairness and due process.
We find this argument unpersuasive because our decision must be guided by our own statutory scheme. Our analysis in Part II A. of this opinion concludes that our own statute does not require automatic dismissal or preclude the filing of the petition after a dismissal of the case without prejudice. Rather, the court has the authority to dismiss when, in the exercise of an informed discretion, it finds that dismissal is required in the interest of justice and consistent with the welfare of the child. See District of Columbia v. D.E.P., supra at 832. Juvenile Rule 48(b), which allows the court to dismiss the petition in the interest of justice and the welfare of the child, sets forth as a factor for consideration "[u]necessary delay in the filing of a petition" or in bringing a respondent's case to hearing or disposition. In this respect, the rule is similar to the corresponding criminal rule.
The criminal rule provides:
If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the Court, or if there is unnecessary delay in bringing a defendant to trial, the Court may dismiss the indictment, information or complaint.
Super.Ct.Crim.R. 48(b). Neither the criminal rule nor the corresponding juvenile rule mandates dismissal. We have held that dismissal with prejudice under Super.Ct.Crim.R. 48(b) "must be for valid reasons reflecting a denial of speedy trial." United States v. Cummings, 301 A.2d 229, 230 (D.C.1973); United States v. Mack, 298 A.2d 509, 510 (D.C.1972). The trial court must make "an informed and carefully balanced judgment based on factors relevant to that constitutional right." Cummings, 301 A.2d at 230 (citing Mack, supra, 298 A.2d 509).
Neither the United States Supreme Court nor this court has considered whether a juvenile has a constitutional right to a speedy trial in a delinquency proceeding. Such proceedings are not "criminal prosecutions" within the meaning of the Sixth Amendment of the United States Constitution, which guarantees the right to a speedy trial.[14]See In re A.L.M., 631 A.2d 894, 898 (D.C.1993) (guarantees under the Sixth Amendment "do not apply directly to juvenile adjudications of delinquency.") (citing McKeiver v. Pennsylvania, 403 U.S. 528, 541, 91 S.Ct. 1976, 1984, 29 L.Ed.2d 647 (1971); In re C.B.N., 499 A.2d 1215, 1218 n. 3 (D.C.1985)). The juvenile system is not a criminal system. It is one which has as its primary focus the welfare and rehabilitation of the child rather than simply that child's factual guilt or innocence. In re M.C.F., supra, at 877 (D.C.1972). However, we have held that "a juvenile respondent [has] a right to counsel based on the due process protection afforded by the Fifth Amendment." A.L.M., 631 A.2d at 898 (citing In re Gault, 387 U.S. 1, 47, 87 S.Ct. 1428, 1454, 18 L.Ed.2d 527 (1967)). Of course, a child alleged to be delinquent has a statutory right to counsel at all critical stages of the proceedings. D.C.Code § 16-2304(a) (1989 Repl.). We have no similar statutory provision prescribing the right to a speedy trial or time restrictions within which a trial in a delinquency case must be held. There is in effect Juv.R. 48(b) which authorizes the trial court to consider, in determining whether to dismiss a petition, any unnecessary delay in filing or in bringing the respondent to hearing or disposition.
Appellant argues that due process protects juveniles against undue delay in juvenile proceedings in order to secure the statutory purpose. The government does not contend otherwise. A primary goal of the juvenile system is protection of the child through treatment and rehabilitation, a goal best achieved by prompt disposition directed toward effectuating it. See Jerry M., supra, *473 580 A.2d at 1278; see also Senate Report at 16. It follows that the right of the juvenile in the system to a speedy hearing and disposition, consistent with the statutory purpose, requires due process protection. Courts from other jurisdictions have concluded, based upon the federal constitution, state constitutions, and/or court rules of procedure, that juveniles have a right to a speedy trial. See, e.g., In re Interest of C.T.F., 316 N.W.2d 865, 868 (Iowa 1982) (constitutions of United States and Iowa provide juveniles the right to speedy trial in delinquency proceedings); In re Welfare of J.D.P., 410 N.W.2d 1, 3 (Minn.App.1987) (delay of trial beyond period set by rules of procedure for juvenile court triggers analysis under balancing test in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)). We hold that a child has a due process right to a fair trial, including a speedy one, consistent with the statutory purpose of the juvenile code, and consonant with the protection of the child and the community. The more difficult question is how a due process right to a speedy disposition applies in the context of a juvenile proceeding where there is at issue not only the interest of justice, but also the welfare and protection of the child.
Some guidance may be gleaned from consideration of the speedy trial issue in criminal cases. In that context, we apply a now familiar multi-factor balancing test in determining whether a defendant's right to a speedy trial has been violated, namely: 1) length of delay; 2) reasons for delay; 3) defendant's assertion of the right; and 4) prejudice to the defendant as a result of the delay. Barker, supra, 407 U.S. at 530, 92 S.Ct. at 2192; Dickerson v. United States, 650 A.2d 680, 684 (D.C.1994); Graves v. United States, 490 A.2d 1086 (D.C.1984) (en banc), cert. denied, 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986). The Supreme Court and this court have held that the right to a speedy trial is triggered by arrest, indictment or other formal accusation. Doggett v. United States, 505 U.S. 647, 650, 112 S.Ct. 2686, 2690, 120 L.Ed.2d 520 (1992); United States v. MacDonald, 456 U.S. 1, 6-7, 102 S.Ct. 1497, 1500-01, 71 L.Ed.2d 696 (1982); Graves, 490 A.2d at 1091. Where a charge is dismissed and then refiled, the period between dismissal and refiling does not count for speedy trial purposes. United States v. Loud Hawk, 474 U.S. 302, 310-12, 106 S.Ct. 648, 653-55, 88 L.Ed.2d 640 (1985); MacDonald, 456 U.S. at 8-9, 102 S.Ct. at 1502-03; Dickerson, 650 A.2d at 684. The four Barker factors are interrelated and "must be considered together with such other circumstances as may be relevant" in the "difficult and sensitive balancing process" by which the court determines whether a defendant's speedy trial right has been denied. Barker, supra, 407 U.S. at 533, 92 S.Ct. at 2193. The trial court's findings in balancing the four factors will not be disturbed unless they are plainly wrong or without evidence to support them. Graves, 490 A.2d at 1091.
Although the factors used in evaluating speedy trial claims for criminal defendants are instructive, for purposes of consideration of a claim of a juvenile in a delinquency proceeding, they must be considered and applied in a manner which is consistent with the goals and purposes of our juvenile system. Thus, we cannot say that in every case speedy trial rights for juvenile offenders are necessarily co-extensive with those for adult criminal defendants. Our analysis of appellant's claim is informed by these considerations.
The five month period between the filing of the petition and D.H.'s trial might not warrant analysis under Barker and its progeny. Barker, supra, 407 U.S. at 530, 92 S.Ct. at 2192 (there is no necessity for inquiry into other factors until there is some presumptively prejudicial delay); Townsend v. United States, 512 A.2d 994, 998 (D.C.1986), cert. denied, 481 U.S. 1052, 107 S.Ct. 2188, 95 L.Ed.2d 843 (1987) (delay of a year or more gives prima facie merit to speedy trial claim); United States v. Bolden, 381 A.2d 624, 627 (D.C.1977). The Supreme Court has stated that
to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from "presumptively prejudicial" delay ... since, by definition, he cannot complain that the government has denied him a "speedy" trial if *474 it has, in fact, prosecuted his case with customary promptness.
Doggett, supra, 505 U.S. at 651-52, 112 S.Ct. at 2690 (quoting Barker, supra, 407 U.S. at 530-31, 92 S.Ct. at 2192).
Appellant argues that in a juvenile case, the length of the delay should relate to the goal of effective and timely rehabilitation. He contends that in light of the legislative history of the juvenile code, a trial delay of more than 30 days should give prima facie merit to a speedy trial claim and shift to the government the burden of justifying the delay. Although Congress incorporated some time limitations into the juvenile code, it deliberately omitted statutory limitations on factfinding and disposition hearings. Senate Report at 16. However, the Senate conferees agreed generally that "as a matter of general policy and for most juvenile cases," it would be desirable, and expected in the long run that there would be a factfinding hearing within 30 days for custody cases, and 60 days for community cases (children not in custody). Id. At the same time, in specifying time limitations for other actions related to juvenile proceedings, the Senate conferees stated that they did not recommend enforcement by dismissal because of the potential detriment to society and the juvenile system. Id. Even where time limitations are imposed, the statute provides that they must be "reasonably construed by the Division for the protection of the community and of the child." D.C.Code § 16-2330(a). Absent any time provisions governing factfinding hearings in delinquency cases, and considering this legislative history and the statutory purposes of protection of the community and the child through rehabilitation, we decline to impose a thirty or sixty day period as one triggering a presumption of prejudice in a case charging a juvenile with murder. The adoption of such an arbitrary timetable, particularly without the benefit of an adequate record, would not serve the goals of the juvenile justice system.[15] Assuming for the sake of argument that a five month delay between the filing of the petition and trial requires an examination of the other Barker factors, weighing the other factors, and considering the interest of justice and the protection of the child, we conclude that there is no basis for dismissal of the petition for violation of appellant's due process right to a speedy trial.
Appellant contends that the length of the delay in the speedy trial analysis should include the period of time following dismissal of the case and the filing of the petition about one year later. Under the Sixth Amendment, no speedy trial right arises until charges are pending. MacDonald, supra, 456 U.S. at 7, 102 S.Ct. at 1501. Thus, "[t]he period between the dismissal and reindictment is not considered when evaluating the Sixth Amendment speedy trial claim." Dickerson, supra, 650 A.2d at 684; MacDonald, 456 U.S. at 7, 102 S.Ct. at 1501. However, any undue delay will be considered under the Due Process Clause. Id. Appellant contends that the holding in MacDonald, that the Speedy Trial Clause has no application after the government dismisses, applies only where the government dismisses in good faith, which the government did not do here. See id. The trial court found that the government, while negligent, did not act in bad faith in this case. We find no reason to disturb that finding. Therefore, assuming for the sake of argument that the MacDonald rule applies only where the government dismisses in good faith, as appellant contends, in light of the trial court's finding, the rule would apply in this case.
Appellant argues that the government acted in bad faith in delaying the filing of the petition in order to gain the tactical advantage of extending the time for filing under D.C.Code § 16-2305(d). We do not view the government's inability to file the petition only two days after the case was *475 referred by the United States Attorney's Office, which resulted in the sanction of dismissal without prejudice, as evidencing a lack of good faith. The ACC represented at the hearing that the government required additional time to determine whether D.H. should be prosecuted as an adult or remain in the juvenile system. See D.C.Code § 16-2307(a)(1) (1989 Repl. & 1995 Supp.).[16] This is a weighty decision. The Corporation Counsel is also required by law to inquire into the facts and make a determination of the legal basis for the petition before filing it. D.C.Code § 16-2305(c). Although the case had been investigated, no doubt, by the United States Attorney, the investigation by an officer of the federal government does not relieve the Corporation Counsel of its responsibility, as imposed by the statute, to make an independent determination concerning whether to petition the case. Appellant has failed to show that the trial court erred in finding that the government's delay in petitioning the case after the initial dismissal resulted from more than negligence. We have said that "with the possible exception of a showing of severe prejudice from pre-arrest delay, such delay will not support a due process claim when the government's actions have been negligent, but not reckless or intentional." Smith v. United States, 414 A.2d 1189, 1195 (D.C.1980); Robinson v. United States, 478 A.2d 1065, 1066 (D.C.1984).[17]
Prejudice to the accused is a factor to be considered in the speedy trial analysis. In a criminal prosecution, this factor is generally viewed "in light of the harm the speedy trial requirements address, namely: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety of the defendant; and (3) to limit the possibility of impairment of the defense, the most important." Dickerson, supra, 650 A.2d at 686 (citations omitted). D.H. claims that he was prejudiced in his ability to prepare his defense because possible witnesses who may have been in a building and a gas station across from the murder scene are unavailable or inaccessible, since the building and gas station have been torn down. The government responds that this showing is insufficient to demonstrate actual prejudice because D.H. did not proffer how the possible witnesses would have helped the defense.
It is insufficient for a defendant merely to assert that a witness, who has now become unavailable, was necessary to the preparation of his defense. An appellant must offer some support for his assertion that the absence of these witnesses actually prejudiced his defense.
Taylor v. United States, 471 A.2d 999, 1003 (D.C.1983) (citations omitted) (citing Reed v. United States, 383 A.2d 316, 320 (D.C.), cert. denied, 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978)). D.H. produced no "evidence respecting the potentially exculpatory testimony that these witness would have delivered." See id. Since D.H. neither claimed nor made any proffer showing how any unavailable, unknown witnesses would have aided his defense nor any efforts that he has made to identify them otherwise, he has not supported adequately his claim that this resulted in denying him a fair trial.
Appellant contends that the court should consider prejudice not only to a juvenile's right to a fair trial, but more importantly, to the detrimental impact that a delay may have upon his right to rehabilitative treatment. Assuming for the sake of argument that a juvenile has a due process right to rehabilitative treatment, the circumstances do not support the claim of that particular prejudice in this case. At the time of the commission of the offense and at the time that the case was dismissed initially, D.H. was already a committed juvenile, and he had another case pending.[18] He was arrested as a juvenile in *476 an unrelated case on November 11, 1989 and detained. Following revocation of his probation in a prior case where he had been adjudicated delinquent, he remained in committed status at the Children's Center until the commitment expired August 1990. Theoretically, he was receiving, or at least was entitled to receive, rehabilitative services as a result of that commitment.[19] We cannot discern that D.H. was deprived of rehabilitative treatment consistent with his individual needs during his commitment as a result of the government's failure to file a petition in this case sooner.[20]
D.H. seems to argue that prejudice should be presumed whenever the government delays filing a delinquency petition because the natural consequence is that any needed treatment will be postponed. While this approach has some appeal, in the context of evaluation of a juvenile's claim of denial of due process, it is unworkable because not every case will result in actual prejudice of the type which rises to the level of denial of due process. Therefore, the facts and circumstances of each case must be examined to determine the nature of any claimed deprivation and the extent of the prejudice. Here, appellant has shown no actual prejudice resulting from the delay of some six months between the time that he was released from his prior commitment and the time that the petition was filed and the trial held. Appellant points out that he was almost eighteen at the time of the disposition in this case, and whatever services were provided him at that time would not be an adequate substitute for what he would have received if the adjudication had occurred closer to the time that he committed the offense.[21] We cannot dispose of the issue on this assumption. It is incumbent upon one claiming this particular prejudice to present facts to the trial court which demonstrate the nature of the prejudice claimed. On this record, we can not say that the prejudice factor weighs significantly in D.H.'s favor.
In summary, applying the Barker factors to appellant's speedy trial claim, we must reject it. First, considering the length of the delay, eliminating from the equation the time that no charges were pending in this case against appellant,[22] the interval between the filing of the petition and trial was not unduly lengthy. Second, the reasons for the government's delay were found to be negligent and not deliberate and for the purpose of gaining some tactical advantage; therefore, such delay would fall within an intermediate category between neutral and more culpable and weigh less heavily against the government. See Graves, supra, 490 A.2d at 1092. Third, appellant has not shown actual prejudice as a result of the delay. The fourth factor, assertion of the right, does not weigh significantly in appellant's favor. Although appellant moved to dismiss the charges because the government delayed in petitioning the case from February 1990 to February 1991, appellant did not move for a prompt trial. The failure to move for a prompt trial as an alternative to dismissal weakens a speedy trial claim on appeal. Id. at 1101. Thus, balancing the Barker factors, and considering the objectives of the juvenile system, we *477 cannot say that appellant is entitled to dismissal of the case on due process grounds for denial of a speedy trial. While not condoning the government's delay in petitioning this serious case, on this record, for the reasons previously stated, we find no basis for reversal of the trial court's order denying dismissal.

III.
D.H. argues that the trial court erred in denying his motion to suppress custodial statements which he claims were taken in violation of Super.Ct.Juv.R. 105(f). He contends that, in contravention of the rule, the detective investigating the homicide used the judicial system to arrange to interrogate D.H. without the consent of the authorities at the Children's Center and without the permission of the child's parent or attorneys in the other cases. D.H. contends that the trial court erred in construing Rule 105 too narrowly as applying only to interviews conducted on the grounds of the Children's Center and in failing to exercise discretion under its supervisory power to sanction a violation of a court rule, even in the absence of a constitutional violation. Whether D.H.'s post-arrest interview was prohibited by Rule 105 presents an issue of first impression for this court.
On November 20, 1989, D.H. was arrested as an adult on a warrant charging him with the murder of Judith Krunklin on February 25, 1989. The arresting officer, Detective Michael G. Sullivan, had obtained the warrant on October 27, 1989 based on incorrect information that D.H.'s birthday was September 3, 1972 rather than 1973. After discovering that D.H. was under commitment to DHS, Detective Sullivan arranged to have D.H. "brought up" to the court by Children's Center transportation for service of the arrest warrant. Detective Sullivan picked up D.H. from the court and took him to the Homicide Division of the MPD where D.H. waived his Miranda rights and signed a PD-47 waiver of rights card. D.H. agreed to give the police a statement and confessed to the shooting of Judith Krunklin. The detective did not obtain permission from the Family Division, D.H.'s parents or his lawyers in other pending cases. Randolph Baker, the Assistant Superintendent at the Cedar Knoll Youth Center, testified that D.H.'s "Plan of the Day" on November 20, 1989 was to go to court on an unrelated offense and to see his attorney at the receiving home. He testified that he would not have allowed police to question D.H. at the Children's Center without approval. However, he testified that it was the Center's usual practice to send a juvenile to Superior Court when he had a criminal warrant pending. On April 26, 1991, D.H. filed a motion to suppress statements based upon the violation of Super.Ct.Juv.R. 105(f).[23]
Rule 105(f) provides, in pertinent part, as follows:
Except for a staff member of a shelter or detention facility or a probation officer, and unless the Division orders otherwise, no person shall be permitted to interview a child held in the facility without the child's parents or attorney being present unless they have been given written permission for the interview to be held without them.
The comment to the rule states that section (f) "is designed to prevent interviews of children in detention by the police and others, without the presence or consent of the child's parents or attorney."[24]
However, D.H. was arrested for murder as an adult pursuant to a valid arrest warrant, and at that time, jurisdiction was transferred to the Criminal Division.[25] Therefore, at the time D.H. gave his custodial statement, Rule 105 was not applicable. *478 The United States Attorney is authorized to charge a juvenile who is sixteen or over as an adult for certain enumerated crimes, including murder, the offense with which D.H. was charged. D.C.Code § 16-2301(3)(A) (1989 Repl. & 1995 Supp.). "[A]n individual is `charged' under [D.C.Code] § 16-2301(3)(A) [1989 Repl.] once a judge has signed and filed an arrest warrant in the warrant office based on probable cause derived from a complaint and supporting affidavit signed by a police officer and approved by an Assistant United States Attorney who has designated on the affidavit and the warrant one of the felony offenses enumerated in § 16-2301(3)(A)." Marrow v. United States, 592 A.2d 1042, 1047 (D.C.1991). Section 16-2301(3)(A) provides, in pertinent part, as follows:
(3) The term "child" means an individual who is under 18 years of age, except that the term "child" does not include an individual who is sixteen years of age or older and 
(A) charged by the United States attorney with (i) murder....
Section 16-2301(3)(A), "by deeming an individual not to be a `child' when certain serious offenses are charged, in effect has decreed, by operation of law, a `transfer' of that individual to the Criminal Division." Marrow, supra, 592 A.2d at 1044 (quoting In re C.S., 384 A.2d 407, 409 (D.C.1977)). Thus, by charging D.H. with murder pursuant to a warrant issued on October 27, 1989, D.H. was transferred "by operation of law" to the Criminal Division. Id. D.H. does not dispute that the warrant was valid and could be served. See Super.Ct.Crim.R. 4(d)(2) ("A warrant or summons for an offense punishable by imprisonment for more than 1 year may be executed or served at any place within the jurisdiction of the United States."); Super.Ct.Crim.R. 5-I; D.C.Code § 23-563(c) ("A person arrested outside the District of Columbia shall be brought before a judge, commissioner, or magistrate and shall be held to answer in the court having jurisdiction...."). Once D.H. was transferred to the Criminal Division, Rule 105 no longer applied, and the detective was at liberty to interview him. See D.C.Code § 4-140 ("Any person arrested in the District of Columbia may be questioned with respect to any matter for a period not to exceed 3 hours immediately following his arrest.").[26]
The government also argues that suppression of D.H.'s statement would contradict the provisions in Super.Ct.Juv.R. 111 which permits a juvenile's voluntary statement to be admitted into evidence. Rule 111, however, merely affirms a child's privilege against self-incrimination. It states that a juvenile's voluntary statement, given after Miranda warnings, may be used against the child in the government's case in chief and only for impeachment if made without a valid waiver. It does not negate the separate protection afforded by Rule 105.[27]
*479 For the foregoing reasons, the judgment appealed from hereby is
Affirmed.
NOTES
[*] Judge WAGNER was an Associate Judge at the time of argument. Her status changed to Chief Judge on June 14, 1994.
[1] See D.C.Code § 23-1321 (1989).
[2] See United States v. Davis, 330 A.2d 751, 752 n. 3 (D.C.1975) ("[L]imited function of a preliminary hearing is to permit judicial consideration of whether there is probable cause to hold an accused for trial."). See also Super.Ct.Crim.R. 5(d).
[3] Pursuant to statute, the court may postpone the filing of a petition for five days after the detention or shelter care hearing. D.C.Code § 16-2312(g); see also In re T.G.T., 515 A.2d 1086, 1087 (D.C.1986). The expression "five day hold" refers to this period. Id.
[4] The two cases against appellant, J-4344-89 and J-2573-89, were dismissed on March 5, 1990 and May 23, 1990 respectively. After the dismissal of J-2573-89, D.H. was returned to his former committed status at the Children's Center in connection with an earlier offense. His commitment in that case was completed on August 5, 1990, and D.H. was released.
[5] D.C.Code § 16-2309 ("Taking [child] into custody"); see also Super.Ct.Juv.R. 4.
[6] Super.Ct.Juv.R. 105(f) reads as follows:

Except for a staff member of a shelter or detention facility or a probation officer, and unless the Division orders otherwise, no person shall be permitted to interview a child held in the facility without the child's parents or attorney being present unless they have been given written permission for the interview to be held without them.
[7] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[8] A PD 47 rights card is "a standard form used by the Metropolitan Police Department with the following questions: 1. Have you read or had read to you the warning as to your rights?; 2. Do you understand these rights?; 3. Do you wish to answer any questions?; 4. Are you willing to answer questions without having an attorney present?". Patton v. United States, 633 A.2d 800, 805 n. 1 (D.C.1993).
[9] The ruling of the motions judge stated, in pertinent part, as follows:

[T]his Court concludes that the arrest and interrogation were lawful and that there were no violations of Respondent's Constitutional rights. The Respondent's statements are therefore admissible at trial.
* * * * * *
Rule 105(f) of the Juvenile Rules of this court prohibits interviews of children held in a juvenile shelter or detention facility without permission of their lawyers, parents or the court. In this case, Detective Sullivan did not take advantage of the Respondent's confinement in a juvenile facility to interview him there. With a warrant in hand, Detective Sullivan removed the Respondent from the custody of the Department of Human Services to arrest him. The interrogation that followed was not the "interview" contemplated by Rule 105.
Moreover, a statement taken during an interview in violation of that rule would not be excluded from evidence unless a Constitutional right or a Miranda right were violated as well.
[10] The exception in D.C.Code § 16-2312(g) provides that at the detention hearing, the court "may not postpone the determination of whether detention or shelter care is required. For good cause shown, however, the Division may grant a continuance of any other part of the hearing (including the filing of petition) for a period not to exceed five days."
[11] See note 3, supra.
[12] In specifying that the government could refile the petition, the trial court evidenced its intention that the dismissal be without prejudice.
[13] In making its ruling, the trial court explained:

I am going to conclude ... that neither the interest of justice nor the welfare of this child justifies dismissal of this case at this time.... I have, so the record is clear, taken account of the seriousness of this particular offense, and I've been moved by my own views of institutional views of the sanctity of human life and what the allegations  and they are only allegations here. I'm quite clear on that, but, still, that's the way it would be in most motions to dismiss for social reasons  what the allegations indicate occurred in this matter.
I don't think that it would serve any particular interest sufficient to essentially say that because the prosecutor didn't do what it should have done rapidly enough, that as a result of that, a homicide case, one allegedly, again, committed in circumstances that should make no one happy, can be swept under the rug, if you will. I just can't do that. If this were almost any other kind of case, I would be happy to dismiss it in order to let the governmental authorities know that this kind of nonaction is not to be tolerated.
By saying these things here and on the record, and that means for possible future review of this matter, I am trying to put the Government on notice that I am not happy with its conduct in this matter. There are too many homicides in the District of Columbia and too many murder cases throughout the city, and throughout the Court and now in the family division in juvenile court. All that's true, and everybody's overworked, but that is not a defense to what this case discloses in my judgement [sic].
Nevertheless, I think it was a matter of negligence and not intent, [counsel]. I don't accept that, and I don't think it was reckless in any accepted sense of that word as it would be applied to a particular individual, although I suppose you could make the argument that when you run a prosecutor's office that allows this kind of thing to happen over a period of time, it kind of shows an institutional recklessness that some people might accept as a proper definition of the word.
I'm not happy about this case, but I don't think it would be in the welfare of your client who, after all, has two previous adjudications and two cases pending, and it certainly wouldn't be in the interest of justice, given the facts of this case as they are currently alleged, for me to dismiss it. So, the motion is respectfully denied.
[14] The Sixth Amendment provides: "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy public trial...."
[15] Appellant moved to dismiss in the interest of justice pursuant to Rule 48(b) and the Due Process Clause. In support of the motion, he argued generally that the government had no legitimate reason for the delay and that he was no longer in need of care and rehabilitation. Appellant did not advance a Barker analysis. Therefore, a record which might have included an analysis of Barker factors, including the customary periods within which similar cases might reasonably be expected to be prosecuted, is not available.
[16] D.C.Code § 16-2307(a)(1) provides that the Corporation Counsel, following consultation with the Director of Social Services, may request the transfer of a child who was fifteen years or more at the time of the charged conduct for criminal prosecution.
[17] To prevail on a claim based upon trial delay, the accused "must demonstrate that the pretrial delay caused a substantial prejudice to his right to a fair trial, and that the delay was an intentional device to gain a tactical advantage over him." United States v. Donaldson, 451 A.2d 51, 56 (D.C.1982).
[18] According to the brief for D.H., custody orders were outstanding for D.H. in both cases.
[19] When a child is found to be delinquent, the court has a broad array of alternatives available to address the child's rehabilitative needs. See D.C.Code § 16-2320(c) (1989 Repl. & 1995 Supp.). The court revoked D.H.'s probation in another case on June 5, 1989. When the court committed D.H. to the Department of Human Services at that time, it had the authority to consider various treatment and rehabilitative options as set forth in D.C.Code § 16-2320(c). See In re J.M.W., 411 A.2d 345, 348 (D.C.1980); see also In re J.A.G., 443 A.2d 13, 15 (D.C.1982).
[20] D.H.'s social file indicates that he had the benefit of all the Social Services Division could provide by traditional probation and as offered through the High Intensity Treatment program prior to revocation of his probation. During his placement in the community at a Youth Shelter House during 1989, D.H. had a history of abscondances which prevented the implementation of meaningful rehabilitation programs for him, according to the report. Thereafter, he was placed in secure detention.
[21] Once jurisdiction of a child has been acquired, it may be retained until he or she reaches the age of twenty-one-years, unless sooner terminated. D.C.Code § 16-2303 (1989 Repl.); In re J.M.W., supra, 411 A.2d at 348.
[22] See Loud Hawk, supra, 474 U.S. at 310-12, 106 S.Ct. at 653-55; MacDonald, supra, 456 U.S. at 7-9, 102 S.Ct. at 1501-03; Dickerson, supra, 650 A.2d at 680.
[23] Appellant also claimed a Sixth Amendment violation; however, he does not raise this issue on appeal. See McNeil v. Wisconsin, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991).
[24] "While Notes of the Advisory Committed on Rules which accompany proposed rules are not authoritative, they are somewhat analogous to a Congressional Committee Report in determining the intention of the framers of the rules." In re D.M.R., 373 A.2d 235, 237 (D.C.1977).
[25] The arrest warrant was valid despite the error in D.H.'s date of birth under the "Leon good faith exception." See Dailey v. United States, 611 A.2d 963, 967 (D.C.1992); United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).
[26] D.H. argues that the Family Court did not lose jurisdiction over him because the murder charged was not a subsequent delinquent act. D.C.Code § 16-2307(h) provides that "[t]ransfer of a child for criminal prosecution terminates the jurisdiction of the [Family] Division over the child with respect to any subsequent delinquent act...." (emphasis added). Marrow, 592 A.2d at 1044. A "`subsequent delinquent act' refers to an act which occurs after adult criminal charges have been filed." "[T]he relevant date for determining whether the Family Division [has] jurisdiction ... is the date on which [appellant] was charged with [an adult offense], and not the date on which the [offense] occurred." In re M.R., 525 A.2d 614, 615 (D.C.1987).

D.H. was committed to DHS on June 6, 1989, for a 14-month period. He was charged on October 27, 1989, for a crime committed on February 25, 1989. Thus, in this case, although the government filed charges after D.H.'s commitment, the murder was a prior act, not a "subsequent delinquent act." D.H. argues that, consequently, no transfer by operation of law occurred and Rule 105 remained applicable to the government. See Marrow, supra, 592 A.2d at 1047; In re M.R., 525 A.2d 614 (D.C.1987). D.H.'s argument cannot prevail because it ignores § 16-2301(3)(A) which transfers jurisdiction from the Family Division to the Criminal Division for the crime charged as well as any subsequent delinquent act.
[27] Statements made by juveniles during custodial interrogation require special caution. See In re D.A.S., 391 A.2d 255, 258 (D.C.1978). A minor's confession is admissible if voluntary and made after a knowing and intelligent waiver of Miranda rights. Id. Here, D.H. waived his Miranda rights, signed a PD 47 card to that effect, and voluntarily made a statement to the police. D.H. does not contend on appeal that the statements were not voluntary or that his waiver was defective.